Hehehehehehe True, true Alright, Ms. Mayta, is that correct? May I please the court? My name is Andrea Mayta, and I along with my co-counsel Dan Walsh represent Willie Starts, Jr. who is the appellant and plaintiff in this case. As this court's aware, in 2008, Congress passed the Americans with Disabilities Amendment Act, which significantly overhauled the existing case law with respect to the ADA. And the reason Congress did this was they believed that the courts had been overly restrictive in determining what constituted a disability. Well, assuming, arguendo, that we agree with you that it's a disability, this lifting requirement, where is there any evidence in the record that a four-hour workday would have enabled him to perform the essential functions of his job? There are several places in the record where even employees of Mars are admitting. No, okay, I'm sorry, cases in the record? No, several places in the record. I'm sorry, I misunderstood you. There are several places in the record that show that Mars knew there was not actually an issue with absences while he was on this reduced shift. For instance, Michael Thompson, who is Mr. Start's immediate supervisor, sent an email to Teresa Aldridge just expounding on the absences, and he said from October to February 2013 there was no issue with absences, and it wasn't until his hours had been increased to six hours from the four hours that the issues with absences popped up again. And so that demonstrates the employers knew, that Mars knew, that there was a causal link between him being able to take his pain medication on the reduced shift, because the reason he needed— If he takes the pain medication, he can't work the reduced shift. No, Your Honor, he needed to take—the reason he was able to work the reduced shift is because he was able to go four hours, take his pain medication. He wouldn't have been able to come back to work after taking his pain medication per Mars' policy that they wouldn't allow him to come back onto the floor after taking pain medication. You're going to need to give some record support, because as the district court determined, his pain occurs whether he works four hours, two hours, or some length of time, and that we don't—you never know when the pain is going to come. So it's according to the record, what the district court determined. So you need to give me some record sites that show that that's wrong. Of course, Your Honor. Record on appeal, page 238, where Mr. Thompson sent the email saying that from October until February, absences were not an issue. It all cropped up again when his hours were increased, and so that is on 238. Additionally, they— Wait, you're saying absence is not an issue. You're saying that he's not having pain prop up just at random times? No, saying that he's able to work those shifts. He missed a great deal of work during the four-hour time. That's what Mars has said in their brief. However, what they cite in support of that is test deposition testimony of Jason Ayers, who is discussing the March incident when his shift time had been increased. The important thing to note in this case is there's a timeline from about a year when there's about 20 different restrictions, at least 20 by counsel's estimations, 20 different workers' compensation restrictions. These hours changed on at least two instances. First, in October 2012, there's a letter from Mars, which I anticipate counsel will bring up, where they are talking about the absences becoming an issue. But in that same letter, they state, you've been cleared to work eight-hour days. We expect you to work eight-hour days. And that was back in September. However, subsequently the record demonstrates his hours were reduced back to four hours. And then from that email, Mr. Thompson's saying from October until February when a brief increase in time happened again, he was not absent from work to a degree that it caused concern to Mars. Is there any evidence in the record that a doctor said that he needed to work a four-hour day instead of an eight-hour day? Because I thought that the doctor had released for eight-hour day. Well, on March 5, 2013, the doctor had released him for eight hours a day. However, what Mars fails to acknowledge is that there was medical documentation, medical substantiation forthcoming. In fact, on March 7, Teresa Aldridge had sent an email stating that she was the nurse for Mars, stating that Mr. Starts needed to have a second opinion about, first of all, the pain management, about chiropractic care, and about potential back surgery. And this was a significant thing to note is this was not the first time he was released for eight-hour days. In that preceding year, on at least two other occasions, he was released from either six hours to eight hours,  Okay, so is the answer, though, to my question, no, there is not evidence in the record that a doctor said that four hours would be appropriate accommodation? No, there was not a doctor. Okay, so you said there was going to be forthcoming. We don't know what the forthcoming would say. We just know that there were going to be maybe more tests. That's not the same thing as saying there would be four hours. What we know is there was a disability. We know that there were consequential limitations known by Mars. We know that Mars knew about the pain and the interplay between the pain medication. We know that every single time Mr. Starts had left, the record demonstrates that even Mars concedes. He told his supervisors why he was leaving. It was because of his pain and to take pain medication. All right, but once he was released to work a full eight-hour shift, did he ever go back and specifically ask the employer to return to the four-hour shift? His return was on March 5th, and no, he didn't specifically say, I would like to return to the four-hour shift, but he consistently made Mars aware of the problem and the limitations, and this court's holding, So he never requested that sort of release. He had already had the four-hour accommodation, and so, No, this is after he's been returned to the eight hours. And this court's precedent in the ASCO case states that once pre-existing accommodation has been withdrawn, the employee doesn't have to say, I hereby re-request this accommodation. The key in an ADA case, and especially when the employer is on notice, is does the employer know about the existing limitations? Does he know about the disability and the limitations? And does he know how to recover? At that point, the employer knew that the doctor had released him for eight hours, so it was incumbent upon Mr. Mars to say, I cannot work eight hours because I need to take my pain medicine, and after four hours, I need to take my pain medicine and go home. And Mr. Mars did say, I'm in pain, and I need to take my medicine. But he didn't ask for the return to the four-hour shift, right? Just a yes or no answer. No, he did not. Okay, thank you. But if I can briefly elaborate on that point respectfully, Your Honor, the cases do not say, you need to ask, I want this specific accommodation. What the interactive process requires is the employer and the employee, once they're aware of this disability and the consequential limitation and a request for an accommodation, they have to work together to determine the best accommodation. And Mr. Startz was simply told at this meeting that what I believe occurred on March 7th, your accommodation is gone. There was no question in terms of, okay, well, we know you're in pain. We know you're seeking additional doctor's notes. We know that even back surgery is on the table. We know this is a significant problem. No, they just said, it's gone. You're expected to work eight hours a day. Even though they knew in the past when he had these issues, when he was cleared for full-time work on two separate occasions in this year, he had to go back to the modified part-time schedule. Because he requested it at those times. Respectfully, Your Honor, he had not requested it. It was the workers' compensation doctor giving. Yeah, they said you needed to go on the modified. So the only thing that the employer had at this time was the eight-hour release. And they're not supposed to have to go when it's – in the cases that you cite where they had to go and try to reason with, they don't have a contrary doctor's thing of exactly the opposite of what the person's trying to get. Respectfully, Your Honor, this Court's precedent forecloses an employer blindly relying on a doctor's note. And that is in Rodriguez v. Conagra. In that case, the employer cannot just blindly rely on a physician's opinion when it's not reasonably objective – when he has not assessed the reasonable objectivity of that. And taking all the evidence that was before Mars, everything Mars knew, what Mars knew is this is an ongoing injury. These restrictions have changed. And they knew that there was an interplay between the back pain and the need to take back medication and why he was missing work. And this Court has stated in Hypes, which is a case that Mars actually cited, if the absences are linked to the disability and the employer knew when they fired him, then summary judgment is not appropriate because that's evidence of pretext. Okay, the employee has to show that the alleged – if you bring up Hypes, the employee has to show that the alleged accommodation would have effectively enabled the employee to perform the essential functions of the job. Okay, in this case, there is not evidence in the record that I know of, and perhaps you can point me to it, that the employee has shown that the alleged accommodation would have effectively enabled the employee. What we have is the employee leaving sporadically. And so if you're going to leave the job sporadically and have to go take medicine sporadically, you're not – you can't perform the functions of the job. Respectfully, Your Honor, that is how the district court and Mars has characterized it, but the absences were not sporadic. If I can read for the record for a moment, ROA 238. This is from Michael Thompson, his shift lead, Teresa. Here are my notes about, well, from October until mid-February, there was not a lot of activity around this. It all seemed to flare up again in February when the doctor – Increasingly speeding up. Take your time. From October until mid-February, there was not a lot of activity around this. It all seemed to flare up again in February when the doctor increased his work hours to six. This seemed to be a trigger point for Will to start missing work again. And that, coupled with the fact that in the record, record on appeal sites 85-1, 53, 496, all – each of his employee, Michael Thompson, even Jason Ayers, who is another supervisor, are talking, yes, we know Will was in pain, yes, we know he had to take back medication, yes, we understand, but – because he told us, because he constantly told us that he was in pain. Now, the ADA does not require magic words. You don't have to say, I hereby request a reasonable accommodation or I hereby think this is the type of accommodation I need. It is an interactive process, and Mars is not entitled to stymie that process by just saying, okay, well, look, here's a time when he's released. We're – King's X, we don't have to accommodate him anymore. And additional support for Mars' discriminatory intent is the fact that on March 5th, 2013, which is the same date he was released to work eight-hour days, Teresa Aldridge, again, who is Mars' nurse, stated, Will will most likely be leaving the business soon. She sent this in an email to Laura Fenners, who is Will's – Because he told them that. He was likely going to quit because he was in such pain, right? He did not tell them that he was – on March 5th, no. No, earlier at other times that he said he didn't know how long he'd keep working. But that's not why she made that statement. It was on the same date. And I'm not aware in the record where he said he was likely to quit. He talked about how intense his pain was. But with respect to this March 5th particular email, on the same date he was released to work eight-hour days, they say he's likely to leave the – Well, she's the nurse. She knows he can't work that. And that's exactly – All these excessive absences even before he had this incident. He was not even a qualified individual. Respectfully, he is qualified because with the reasonable accommodation of four hours, he was able to work. And that's precisely the point you said she – But he still had excessive absences even during those times. But – Before and after. What I'm saying is those absences generally occurred during the time period where his hours had been increased. And if you look, there's a brief time in September when his hours were increased and a time in February when briefly they were increased. And they went back to – They went back down to four hours until March 5th when he was finally released to eight hours. So it doesn't make sense to say, well, he was released eight hours. This is the first time that ever happened. We think he's going to be okay to work. Your Honor, you brought up a point that she knew he wasn't going to be able to do this. That's absolutely right. They knew. Mars knew. Don't you think an employer needs to have employees who can come to work and do the job? He wasn't qualified to do the job because of the pain medicine. And what if everybody wanted a four-hour week? Respectfully, Your Honor, he was not – People get headaches. Who knows? He wasn't requesting a four-hour shift indefinitely. He was requesting a four-hour shift while he received treatment. And the ADA, specifically the statute, says modified or part-time work schedules are a type of reasonable accommodation. So this is not the type of situation where someone who just has a headache can say, okay, well, I need an accommodation. No, this is a documented back injury he sustained on the job. Well, he wasn't actually requesting a four-hour shift. But just assuming arguendo that you can create a fact issue on that, my other question was if he's qualified. And you told me that the record on appeal 238 tells me that he was qualified. Is there something else that if I go back and look at this record, what creates a fact issue that he's a qualified individual? The fact that when he was working four-hour shifts and when he was given this reasonable accommodation, there were no – Mars did not have an issue with his absences. Only when they decided that they were going to terminate him or build the groundwork to lay the groundwork to terminate him did they determine that this was an issue. He's qualified because – Okay. So what do I look at in the record that creates the fact issue? In 238, the fact that Mars – Is it page 238? Is that the only thing to look at? I'm just trying to make sure I got the universe or whatever documents you want me to go back and read that shows the creature fact issue. And the fact, additionally, in 692, their policy was for guidance only, and he had issues with absences in the past. In ROA 451, he had 18 absences. In 2009, they did not – Mars did not terminate him based on that, and this Court has held. In fact, in the Carmona case, where a similar issue popped up where the employer was saying excessive absences preclude – Your Honor, see, I'm out of time. May I finish my – Finish your sentence. In the Carmona case, this Court – they dealt with that same issue of excessive absences, and this Court said that – this Court held that the jury was entitled to consider this unwritten policy of leniency versus the written policy. Even if Southwest said this is how many absences will allow, the court – the jury – it's a jury – it was a jury question. The jury is entitled to consider what did they actually do in practice. And here, Mars wants to – Mars jumped on the chance to terminate him. But in the past, the evidence shows – the summary judgment evidence shows that they were lenient with respect to absences, which demonstrates pretext. All right. Thank you. I look forward to talking to you during rebuttal. You've reserved some rebuttal time. All right. Mr. Flores. Your Honors, may it please the Court, David Flores for Defendant Mars. We submit that summary judgment should be affirmed. There are no triable issues of fact regarding plaintiff's claims of disability discrimination or failure to accommodate. From the questions, I think the judges are – you're already very familiar with the record. But let me point you to – there was a fair amount of discussion about when plaintiffs incurred the missed time for which he was disciplined and eventually terminated. I wanted to start with the last statement by Ms. Melta about that in 2009, he had 18 unauthorized absences, excessive absences, but you didn't fire him then. So is the fact that – does that prove pretext? No, it doesn't because in 2011, he incurred over 30 points for missed time, a point being the equivalent of a missed day. And all these occurred as a result of his failure to report why he was leaving, and that creates – Failure to report for work or failure to explain why he was leaving? Failure to explain why he was leaving. And I would refer the Court to pages 223 through 235. That's the record of his absences. He accumulated these points, and the MARS policy says if you have eight points, you're subject to termination. It's a neutral policy. It's been uniformly enforced. Two others – So how many points do you get for 18 unauthorized absences? In 2009, he had 18 unauthorized absences. How many points would that be? You get a point per absence? Depends on how it was incurred. I'm not sure that's in the record as to how many points he was awarded. You get one point per absence? Are there different amounts of percentages of points? You get a point for a missed day or a significant portion of a day. That warrants – It seems like 18 would earn you at least eight points, but he wasn't fired then. I'm just trying to see if there's some consistency here. You know, that 18-point number has been bandied about. I'm not familiar with that. It's not points. It says unauthorized absences. I'm not familiar with that aspect of the record. I would have to be. Well, you're the lawyer. Yeah, I know. Yeah, it's bad, huh? I'm not familiar. I wasn't the one who did the summary judgment. That's not an excuse. I'm sorry, Your Honor. I'm not familiar with his 2009 record. I do know that 2011, he had over 30 points. You're trying to provide a point that if eight's the threshold, what difference does it make whether it's 18 or 30? The opposing counsel says you acted differently in 2009 than 2011. I don't think we did. Why not? I mean, what do you have to tell me that you didn't? Tell us. Well, in 2012, he was specifically warned that he had accumulated too many points and that he was missing too many days of work without authorization. Was it only the 2011 points that were relied upon in 2012? No, these points started in 2003 and 2011. And quite frankly, the record I have, Your Honor, reflects only five points, only four points in 2011. And that's at pages 223 through 230. So do you have 30 points in 2012? Pardon? Are there 30 points in 2012? The significant points started in 2012 with unauthorized absences. And at pages 224 through 225 reflect the points he incurred for unauthorized absences. And he was notified on October 3, 2012, that he had incurred too many unauthorized absences. And at that point, the number was 23.5 that he had incurred, and that he would have to improve his attendance or else he would be subject to discipline. And, yes, for a little period of time after that, he did improve his attendance, which shows that he was able to when he wanted, which tangentially shows that the prior absences were unauthorized and subject to discipline. And, I mean, the argument that plaintiffs should be reasonably accommodated with a four-hour workday, that didn't work with plaintiffs because he would leave whenever, and that's why he would get the points. Well, go back a second to the earlier line of question. What's your response to the argument, and this is the same point Judge Clement was asking, and maybe you answered it and I didn't get it, but what's your response from the record? I'm not sure what you have up there on that paper, but what's your response from the record in terms of counsel opposite's assertion that he had a lot of absences previously, but he was not terminated. In other words, Simpson showed this as pretext. What's your response to us based on the record that we will have available to us? My response is that I don't believe the record supports that. Well, we just kind of not. What you believe is not altogether helpful. I'm asking you what. Well, counsel, here's the problem. You represent Mars. Yes. Got your brief up here. You're, I guess, from Pennsylvania, but we expect counsel who's standing in front of us to know the case, and whether you did it below or not, once you come through the portals, I mean we expect counsel to answer our question and know the case cold. So I'm not trying to put you at advantage, but it really doesn't help us if you can't tell us the answers to the questions that are before. We've read the briefs, so we're trying to get what's the answer. I mean, not your personal belief, but that's the level we're expecting. They've made that assertion, so we just want to know if you did X, no, not U, the company, she says, well, this is pretext. They didn't let him go before we get too much on the what the point. So I'm just asking, as the lawyer for Mars, what is your appreciation of the record with respect to rebutting the claim of pretext? If you don't know, then just say that. Sorry, Your Honor. My belief is that the record will not support that assertion, that the plaintiff incurred 17 points in 2009. My information is that it was only several, two or three points in 2011, and that the significant absences started and he started missing significant work days, and he was fully accommodated the entire period of time from 2011 through 2012, 2013, after he had his work comp injury. He was given four-hour days, six-hour days. He was given light duty, and he still missed significant days' work, and that's how we accumulated the points. Do we even get to pretext if he's not qualified? No. So if we resolve the question on not qualified and you win there, we don't get to whether or not there's pretext. That's correct. And if we resolve the question on not disability, we don't get to the issue of pretext. That's correct. And if we resolve the question on that the company didn't know that there was an accommodation requested, we don't get to the issue of pretext. Correct? That's correct. Okay. But if we get to pretext, you have some difficulties with the record. Correct? No. I have no difficulties. Well, you can't tell us what the record says. I think that's a difficulty. Well, I apologize, Your Honor. I don't think the record says that he . . . Well, opposing counsel says it does, and you don't know what it says, and so you're at a disadvantage. Right? I am at a disadvantage, but it's my belief that he did not incur 18 points. I don't recall that from plaintiff's brief in 2009. And in addition . . . Well, I don't think the plaintiff pointed to any part in the record where it reflected that he had accumulated 18 points in 2009. As for your record, I can assert 450 to 51, so maybe you can check that. I don't have that. I don't have that. You don't have your record excerpts with you? I do not, Your Honor. Okay. Okay. I'll bet Ms. Mata can find it. When you have your opportunity for rebuttal. Can we talk about disability then? This seems to be some concern that if we rely on our pre-ADA precedent about the lifting requirement, that we may be getting into a circuit split, that there's already a circuit split between the Tenth and the Fourth Circuits on whether a lifting requirement post the amendments makes you disabled or not. Should we delve into that in this case? The district court relied on pre-ADA precedent. No. I disagree with that, Your Honor. The district court did rely on some cases that were decided prior to the . . . Okay. Has this court held post-ADA in a published case that the lifting requirements make you disabled or make you not disabled or insufficient for disability? Have we held that in a published case post-ADA? No, the district court did not have that. Okay. So then . . . There is a district court case that plaintiffs cited that we believe is distinguishable. They cited a case to the effect that a 20-pound weight restriction would not be sufficient for . . . would be sufficient to show disability, but we believe that under prior precedent of this circuit, that court . . . that district court went the wrong way. Right, but we have to look at the issue anew in light of the amendments, and the circuits are coming down in different places. Yes. And I don't think you all have briefed this in any kind of way that says why we should come down your way versus her way. And it's an issue of importance in a circuit split. We would . . . the point . . . the way we would approach it, Your Honor, is that the issue of whether the plaintiff could lift 20 pounds was not . . . the reason . . . did not have anything to do with the reason why he was terminated. The reason he was terminated was because he failed to show up for work. He was fully accommodated on all work . . . on all restrictions, including the 20 pounds. So we should assume arguendo that he . . . We should assume arguendo for purposes of this appeal that he was disabled and not get into the issue of whether it's a disability to not be able to lift. Is that what you're saying today? No, I don't believe the courts should assume that he was disabled. I am saying that there are easier issues for the court to approach the decision, and that is that he is not a qualified individual because he could not show up for work on a consistent basis. And that has been repeatedly found by this court and courts, district courts within this court, to be a failure of proof of an ADA case. Okay, so we should sidestep the disability question and not address it at all, which is the same, basically, as assuming arguendo and moving on. Yeah, that's one way to approach it. I mean, it's very clear . . . Of course, it's critical that he be a qualified individual. We don't even get to the next step. If he's not a qualified individual, that's the end of it. Correct, Your Honor. And, I mean, I don't think there's also any dispute that for the four years he was fully accommodated, and it was only when his own, the same doctor that had authorized the lower hours, said he was capable of working eight hours, that he started accumulating additional points. And he doesn't dispute that he didn't work eight hours and was subject to additional points and additional discipline as a result. Why doesn't that support plaintiff's theory, that it was only when he was asked to work eight hours that he started missing work again? There was a period of time when his points were less, but by then he had already accumulated well over 30 points and was subject to termination as a result. At the time of termination, he had something on the order of 38 points. And there are, we cited in summary judgment papers, two others that have been terminated for accumulation of over eight points. So there are, we have provided comparators that have not been disabled who have been disciplined. Plaintiff has cited no comparator who was not treated, was treated differently, but was not disabled. So we would submit that additionally supports the district court's decision to grant summary judgment here. And we would refer the court to the Allen v. Babcock case where the court said that defendants are entitled to rely on plaintiff's doctor when there's a return to work authorization from the doctor. Same way here. Mars was allowed to rely on plaintiff's doctor, on the work comp doctor, who said he was allowed to return to work eight hours. What plaintiff wants to say is, no, the doctor was wrong. I only had to work four hours and I shouldn't be disciplined for it. That's not the law. The same doctor who had given him lower hours before said in March 2013 he was able to work eight hours. And what plaintiff wants to say is, no, plaintiff can overrule the statement of the doctor and shock himself presumably and get an alternative. Plaintiff failed to do that. He provided Mars with no evidence that he was going to be able to get anything that supervened that doctor. And Mars reasonably and properly acted on the basis of what the doctor was telling it, which was plaintiff can work eight hours and plaintiff shouldn't be able to supervene the statement of his own doctor as to his ability to work. What do you do with the Carmona that's been cited extensively by opposing counsel? Pardon? The Carmona versus Southwest Airlines case. How do you distinguish that case? I don't think that's applicable. If that's the one that involves the person that was fired after the pregnancy, that has nothing to do with this issue here? This has a regular attendance for seven years that was accepted. That's been cited extensively by opposing counsel. If you don't have a distinction, don't just go on with whatever else you're going to do. To distinguish it in the brief, I don't recall it offhand, Your Honor. Okay. All right. Anything further, Mr. Flores? That's all, Your Honor. All right. Thank you, sir. Ms. Smader, you have rebuttal. I think it's very significant to view all this evidence in light of the prism of the summary judgment standard. The question isn't, as a matter of law, is Mr. Startz qualified? The question isn't, as a matter of law, is there a disability? Rather, the question is, as a matter of law, has Mars demonstrated that no reasonable jury can find that Mr. Startz was not qualified? There's a fact issue on this matter. They say one thing, we say the other. That's the very definition of a fact issue. Mars' contention, as well as the district court, their position, they say he is not qualified because he's unable to work regularly. Mr. Startz had proffered summary judgment evidence showing that he was able to work regularly during the shift, when he had the four-hour shift. Whether or not the district court believed that Mars' evidence weighed higher, that's beside the point. As long as a reasonable jury could find for Mr. Startz, Mars is not entitled to summary judgment. And the problem with what the district court did in this case is it weighed the evidence. In fact, there is a portion in the opinion where the district court expressly says this argument weighs against Mr. Startz's argument. And it's just one example of the district court spinning the evidence in Mars' favor. All reasonable inferences must be given to Mr. Startz. All evidence that is uncontested that he brings forth must be regarded as true. And the evidence must be viewed in the light most favorable to Mr. Startz. And given that standard, this case is rife with fact issues. Now, Your Honor, you had asked defense counsel about the issue of disability. Why should this court find that the prior cases are superseded? And I believe it's because in the EEOC regulations, they acknowledge that this specific type of disability, a 20-pound weight restriction that lasts for several months is a disability because it means that the individual is substantially impaired in the major life activity of lifting. Do you recognize that some circuits have not agreed with you? I do recognize that, Your Honor. I'm not off the top of my head. At least the fourth. With respect to a heavy weight lifting restriction? I don't recall the case, but I'm more than happy to brief the issue for the court after arguments if the court should desire. Well, I guess for you to prevail, we have to wade into this issue. Is that right? Yes. But if we decided on the other prong and there is a fact issue, then we don't reach it. But we have to wade into this issue. Your Honor. But you haven't briefed what all the circuits say and what all the EEOC regulations say? Your Honor, respectfully, in our appellant's opening brief, yes, we have briefed what the EEOC regulations state. I can pull the brief and cite it for the court. I have the brief. It's right here. Yes, and also in the reply brief. Excuse me, I'm sorry for interrupting. In the reply brief, the EEOC regulations are specifically mentioned. But you haven't gone through the circuits? No, Your Honor. And the Fourth Circuit case, in my research, had not come up. And we did cite a district court case, Molina, which is out of the Western District of Texas, which went through this analysis and found that because the new amendments specifically, not only specifically state that lifting is a major life activity, not only because the EEOC regulations interpret it different, but specifically because the ADA Amendments Act has said that the standard previously used, which is severely restricted, is too high. And this court has actually recognized in the Amsel case that, of course, the ADA Amendments Act has a significant impact on the case law because the standard was extraordinarily high. And so it would result in overruling existing cases. But just this court has not had a published opinion dealing with this primary issue. And it's important because these cases are finally coming up to the circuit courts. The amendments became effective in 2009, but there is not a lot of case law on this precise issue. But there are authorities cited in our brief, which makes it, which demonstrates why the standard should be changed and which demonstrates why it was incorrect for the district court to rely on the authorities that it did. Because the district court didn't analyze whether Mr. Startz was impaired. The district court did not go through the evidence he presented. The district court instead enacted a per se rule saying, the Fifth Circuit President forecloses a finding that you are impaired if you have a 20-pound weight restriction. The district court didn't consider the fact that even his functional capability evaluation said that he had trouble kneeling, stooping, bending. I think there is a lot of issues the court did not consider in terms of analyzing what disability he had. But the per se rule it applied was incorrect just because those cases dealt with a very much higher standard. And specifically the Perdoza case tried to, they minced words between heavy lifting and regular lifting. And the EEOC regulations have now clarified that that type of distinction is not proper. That's the amount I have. All right. Thank you for your argument.